**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MOHAMMEDAN CONSUL ES LAMONT DURELL BELTON, Plaintiff, v. MALFEASANCE TASK FORCE, Defendant. | Civil Action No. 12-3519 (RBK) |
| MOHAMMEDAN CONSUL ES LAMONT DURELL BELTON, Plaintiff, v. MALFEASANCE TASK FORCE, Defendant. | Civil Action No. 12-3520 (RBK) **MEMORANDUM OPINION AND ORDER** **APPLIES TO BOTH ACTIONS** |

These two, seemingly related, matters come before the Court upon submissions of two sets of paperwork; each of these submissions arrived unaccompanied by either a filing fee or by an application to proceed in forma pauperis, and it appearing that:

1. The submission docketed in Mohammedan Consul Es Lamont Durell Belton v. Malfeasance Task Force ("Malfeasance-I"), Civil Action No. 12-3519 (RBK) (D.N.J.), is executed in the style indicating that the draftor(s) was/were affected by "Moorish," "Marrakush," "Murakush" or akin perceptions, which often coincide with

"redempotionist" and/or "sovereign citizen" socio-political beliefs. See Bey v. Stumpf, 2011 U.S. Dist. LEXIS 120076, at *2-13 (D.N.J. Oct. 17, 2011) (detailing various aspects of said position). Heavily peppered with senselessly used Latin phrases, references to maritime law and the treaties having no relation to any events that could have taken place in the modern United States, often relying on self-created nearly-gibberish terminology, that particular submission strives to impress the reader by mimicking a set of enforceable legal documents and, seemingly aiming at that goal, self-designates itself as a "Writ of Prohibition." See Malfeasance-I, Docket Entry No. 1. The best this Court can surmise, the Malfeasance-I submission was executed in light of commencement of a certain criminal proceeding in the Superior Court of New Jersey, Law Division, Somerset County ("Law Division"); that criminal prosecution is, seemingly, underway and is conducted against a certain individual named Clifton McMillan ("Clifton"). See id. at 2. It appears that the Malfeasance-I submission seeks this Court's order directing the Law Division to halt or wholly abandon Clifton's prosecution. See id.

2. The submission docketed in Mohammedan Consul Es Lamont Durell Belton v. Malfeasance Task Force ("Malfeasance-II"), Civil Action No. 12-3520 (RBK) (D.N.J.), is executed in exactly same style. See Malfeasance-II, Docket Entry No. 1. The best this Court can surmise, the Malfeasance-II submission was executed in light of commencement of a certain proceeding in the Supreme Court of New York, Family Court Division ("Family Court"), against a certain individual named Drexel McMillan ("Drexel"). See id. at 2. The Malfeasance-II seemingly seeks this Court's intervention in the aforesaid Family Court action. See id.

3. Being drafted in "Marrakush"-style argot and asserting "Marrakush"-type rights and claims, each of these submissions presents a facially deficient pleading.

> Moorish and Redemptionist Movements. Two concepts, which may or may not operate as interrelated, color the issues at hand. One of these concepts underlies ethnic/religious identification movement of certain groups of individuals who refer to themselves as "Moors," while the other concept provides the basis for another movement of certain groups of individuals, which frequently produces these individuals' denouncement of United States citizenship, self-declaration of other, imaginary "citizenship" and accompanying self-declaration of equally imaginary "diplomatic immunity."
>
> [a]. Moorish Movement
>
> In 1998, the United States Court of Appeals for the Seventh Circuit - being one of the first courts to detail the concept of Moorish movement, observed as follows:
>
>> [The Moorish Science Temple of America is a] black Islamic sect . . . . [T]hree-fourths of its temples (congregations) are inside prisons. The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . . Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)
>
> Johnson-Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[1]
>
> [b]. "Redemptionism," "Paper Terrorism" and Related Concepts

---

[1] The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent." Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

Shortly after the concept of Moorish movement was outlined by the Seventh Circuit, discussions of another movement appeared on the pages of legal opinions issued by the federal judiciary; that other movement was dubbed as "sovereign citizenship" movement. This movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a right-wing anarchist ideology originating in the theories of a group called the Posse Comitatus in the 1970s. Its adherents believe that virtually all existing government in the United States is illegitimate . . . . [Therefore, such] "sovereign citizens" wage war against the government and other forms of authority using "paper terrorism" harassment and intimidation tactics, and occasionally resorting to [physical] violence.

Sovereign Citizen Movement, Anti-Defamation League, at <<http://www.adl.org/Learn/ext_us/SCM.asp?LEARN_Cat=Extremism&LEARN_SubC at=Extremism_in_America&xpicked=4&item=sov>> (visited on Mar. 31, 2011).[2] Consequently, a decade

---

[2] The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of "world passports." "World passports," issued by the so-called World Service Authority ("WSA"), are not recognized, in the United States and in the majority of world nations, as substitutes to official documents, such as national passports or drivers' licenses. See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/07m1310.pdf>>. A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states. See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006). The WSA has been promoting "world citizenship" by issuing documents largely similar in their appearance to regular national passports, which the WSA called "world passports," to any person who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain such "passport" by filling out an application form at the WSA website. See <<http://www.worldgovernment.org/>>. Therefore, while some persons just denounce their United States citizenship under the claim of sovereign citizenship, see, e.g., Roche v. Attorney General, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. 2011), others accompany their denouncements of United States citizenship by applications for "world passports" and attempts to use these passports as legally cognizable documents, sometimes for the purposes of perpetrating criminal schemes in the United States. See, e.g., Asghar v. State, 698 N.E.2d 879 (Ind. Ct. App. 1998). Moreover, a person's denouncement of his/her United States citizenship (being occasionally accompanied by the person's obtaining of a "world passport") frequently produces a peculiar "side effect" in the form of that person's self-grant of alternative, imaginary citizenship

after the Seventh Circuit's issuance of Bey v. Lane, the United States Court of Appeals for the Third Circuit noted a stream of government actions aimed at controlling the "paper terrorism" activities of sovereign citizens, which - by then - matured into a wide-spread criminal scheme, where the scheme participants' "self-legitimized" their names for the purposes of initiating fraudulent legal transactions. The Court of Appeals explained:

> Evidently, [adherents of this scheme have been] filing [fraudulent] financing statements under Article 9 of the UCC, which sets forth a process for perfecting security interests in property. These liens and judgments, accessible on financing statement forms, are easy to file. Once registered, however, the fraudulent liens are very burdensome to remove. For example, in a New Jersey incident, [one group] registered a fraudulent $ 14.5 million lien with the New Jersey Department of Revenue against a federal prosecutor and a $ 3.5 million lien against a federal judge for using [the group participants'] "copyrighted" names in court papers and hearings . . . . [Adherents of this scheme] have filed these commercial liens with state departments of revenue, departments of state, or other the state agencies responsible for receiving and recording these financial instruments. Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms. [These publications built on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." . . . Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of

---

which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid the reach of law. See, e.g., U.S. Dist. Court v. Ephriam, 2009 U.S. Dist. LEXIS 103284 (D. Kan. Nov. 4, 2009).

> prisoners, to keep him in custody. If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008); accord Roche, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 2 (noting that the "sovereign citizen" litigant elected to present the district court's dismissal of his petition as a "contract" between the court and the litigant).

The "strawman" concept is, occasionally, presented/exploited somewhat differently by those redemptionists who claim that - at the moment of their denouncement of United States citizenship and/or their accompanying self-grant of imaginary alternative citizenship - their "strawman" incarnation became "deceased," and their live persons quasi-expatriated from the U.S. (while continuing their actual physical residence in the United States). In connection with this odd quasi-expatriation scheme, such redemptionists often claim that their live persons: (a) hold "estates" in the form of actual physical bodies of their respective "quasi-deceased" strawmen;[3] and (b) reside in geographic locales "self-claimed away" from the United States.

---

[3] This "estate" concept is legally deficient on its face. As one court explained,

> [such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate. See Greneker v. Sprouse, 263 S.C. 571, 574, 211 S.E.2d 879 (1975) (clarifying that the estate is limited to the real and personal property of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864, 677 N.E.2d 33, 222 Ill. Dec. 220 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855 (Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same); Snyder v. Holy Cross Hospital, 30 Md. App. 317, 352 A.2d 334 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

> [c]. Interplay Between Moorish and Sovereign Citizenship Movements
>
> It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship movement (or with one's professing the theory of redemptionism, or with one's practice of "paper terrorism," claims of self- granted "diplomatic immunity," etc.). However, and unfortunately enough, certain groups of individuals began merging these concepts by building on their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals deduce either from their self-granted "Moorish citizenship" and from their correspondingly-produced homemade "Moorish" documents (or from correspondingly-obtained "world passports") or from a multitude of other, equally non-cognizable under the law, bases, which these individuals keep creating in order to support their allegations of "diplomatic immunity."[4]
>
> Murakush-Amexem, 790 F. Supp. 2d 241, 2452-12 (footnotes in original).

4. Moreover, any drafter's reliance on an ancient treaty wholly unrelated to the factual events alleged brings that drafter's submission dangerously close to being frivolous.

---

[4] Such claims of "diplomatic immunity" are without merit. As it was already observed,

> [Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments, since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone may renounce his/her United States citizenship, but this fact in no way establishes that Plaintiffs actually expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings. See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

> [The key] feature present virtually in every submission made [in this type of cases] is these litigants' nearly invariable invocation of the Barbary Treaties (and, specifically, the Treaty with Morocco) in the context of challenging their searches, arrests, confinements, criminal proceedings, bails, fees, convictions, etc. that took place entirely within the United States territory and were effectuated by the law enforcement and judicial officers of the States of New Jersey, Delaware, Virginia, Florida, etc. All provisions of the Treaty with Morocco are, however, wholly inapposite to the type of challenges . . . . As noted supra, the Treaty with Morocco was executed, as all Barbary Treaties, with the aim to: (a) eliminate, or at least curtail, the ill of piracy plaguing the coastal waters and ports of the post-medieval North African geopolitical bodies; and (b) eliminate, or at least halt the rise of, the fees charged by the rules of these geo-political bodies to the then-developing American merchantry for keeping "peace" in the ports and coastal waters subject to their dominion. See Frank Lambert, The Barbary Wars: American Independence in the Atlantic World (2007). It is, therefore, hardly surprising that the bulk of the provisions of the Barbary Treaties: (a) focused on issues of maritime/admiralty, war, merchant purchases/sales and akin matters; and (b) were set forth in terms of protections of "vessels." This is particularly obvious in the Treaty with Morocco, which was a short accord consisting of mere twenty-five Articles, with only three Articles focusing not on acts of war, vessels, merchant activities, etc. but on the acts against generic civilian human beings. See 1836 U.S.T. LEXIS 10, arts. 6, 20 and 21. . . . None of these three Articles could be read as applying to habeas or civil rights claims raised by [the "Marrakush" litigants] against state police or prosecutorial officers, or judges, as to the claims based on the events of [their] arrests, incarceration, bailing, prosecution, convictions, etc. See, e.g., Seals-Bey v. Cross, 2010 U.S. Dist. LEXIS 87794 (N.D. W. Va. July 23, 2010) . . . . Indeed, Article Six of the Treaty, was fashioned to prevent undue enslaving of American citizens (and also to prevent theft of American citizens' goods) in the Mediterraneans by pirating Moors who were either of Morrocan or of non-Morrocan domicile and who were taking undue advantage of the passage ways, trade, accommodations, etc. in Moroccan coastal waters and ports. This Article is facially inapplicable to the [events which did] not occur anywhere near the coastal waters and ports of the Kingdom of Morocco and, to top it all off, were not conducted by Moors. See Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L. Rev. 830, 876 (2006) (under the "Treaty with Morocco, . . . the locus of the [T]reaty partners' interaction [was] confined to the Mediterranean and therefore not within the [geographical] jurisdiction of the United States"); accord Pitt-Bey v. District of Columbia, 942 A.2d 1132 (D.C. 2008) (a self-proclaimed "Moorish" minister has no

> diplomatic immunity protection from criminal proceedings conducted within the United States territory). Analogously, Articles Twenty and Twenty-One of the Treaty are facially inapplicable to [the "Marrakush" litigants], since they had no right to consular assistance, and no United States citizen killed or wounded them in the Mediterranean: all the events they complaint about occurred] well within the borders of the United States . . . . See United States v. Casey, 2005 U.S. Dist. LEXIS 39785 (E.D. Mo. July 21, 2005) (the decision to criminally prosecute a self-declared "Moor" is constitutionally independent of any consular interest in assistance) (citing United States v. Ortiz, 315 F.3d 873, 886 (8th Cir. 2002); United States v. De La Pava, 268 F.3d 157, 165-66 (2nd Cir. 2001); United States v. Emuegbunam, 268 F.3d 377, 391-94 (6th Cir. 2001); United States v. Lombera-Camorlinga, 206 F.3d 882, 885-86 (9th Cir. 2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1195-96 (11th Cir. 2000)). Two conclusions ensue from the aforesaid analysis. The first one is that all . . . claims challenging any events . . . that occur within what is the United States' actual geographical territory (and, especially, if these events involve those individuals who reside within that territory) cannot implicate any provision of the Treaty with Morocco. The second conclusion, building on the prior one, is that all such . . . claims . . . are necessarily frivolous which, in turn, means that any pleading asserting such claims is not bona fide and warrants no examination on merits.

Murakush-Amexem, 790 F. Supp. 2d 241, 2011 U.S. Dist. LEXIS 51887 at *78-88 (footnotes omitted).

5. Deficiencies seemingly ensuing from the above-described "Marrakush" style of drafting and "Marrakush"-type claims mired the submissions currently before the Court. Specifically, the intended plaintiffs in these two matters seem to be Clifton and Drexel, but these de facto plaintiffs are, allegedly, "represented" by a person who designated himself/herself by using the alias "Mohammedan Consul Es Lamont Durell Belton." See Malfeasance-I, Docket Entry No. 1; Malfeasance-II, Docket Entry No. 1.

   a. Under the "next friend" doctrine, standing is allowed to a third person so this third person could file and pursue a claim in court on behalf of someone who is unable

to do so on his or her own. The doctrine dates back to the English Habeas Corpus Act of 1679 and provides a narrow exception to the "case or controversy" requirement set forth in the Article III of Constitution. See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990). The Whitmore Court set out two requirements that should be met by the one seeking to qualify for "next friend" standing: (1) "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf [(s)he] seeks to litigate" (and it has been suggested that a "'next friend' must have some significant relationship with the real party in interest"); and (2) "the 'next friend' must provide an adequate explanation — such as inaccessibility, mental incompetence, or other disability — why the real party in interest cannot appear on his own behalf to prosecute the action." Id. at 163-64. Since Witmore, the Supreme Court further elaborated the standing requirements of Article III in terms of a three-part test, i.e., whether the plaintiff can demonstrate an injury in fact that is fairly traceable to the challenged actions of the defendant and likely to be redressed by a favorable judicial decision. See Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 102-103 (1998). However, "the point has always been the same: whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" Id., at 103 n. 5 (quoting Warth v. Seldin, 422 U.S. 490, 508 (1975)); see also, Sprint Communs. Co., L.P. v. APCC Servs., 554 U.S. 269, 301 (2008) (Roberts, J., dissenting) ("The absence of any right to the substantive recovery means that respondents cannot benefit from the judgment they seek and thus lack Article III standing.

'When you got nothing, you got nothing to lose'") (quoting, with correction of grammar, Bob Dylan, Like A Rolling Stone, in On Highway 61, Revisited (Columbia Records 1965)). Here, it is self-evident that "Mohammedan Consul Es Lamont Durell Belton" neither has Clifton and/or Drexel's best interests at heart, nor can "Mohammedan Consul Es Lamont Durell Belton" show Clifton and/or Drexel's lack of capacity to prosecute violations of their rights. Thus, "Mohammedan Consul Es Lamont Durell Belton" cannot proceed jus tertii on behalf of either Clifton or Drexel.

b. With the same token, "Mohammedan Consul Es Lamont Durell Belton" cannot act as Clifton or Drexel's legal counsel.

> "In all courts of the United States the parties may plead and conduct their own cases personally or by *counsel* as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." 28 U.S.C. § 1654 (emphasis supplied). . . . While a duly licensed attorney may [operate as] a law firm, see Puckett v. McPhillips Shinbaum, LLP, 2008 U.S. Dist. LEXIS 26215 (M.D. Ala. Mar. 31, 2008), [an entity self-designating itself as a "law firm"] cannot qualify as "counsel" . . . A fortiori, an entity not qualified as an actual law firm cannot represent anyone in the court of law. Similarly, a person not duly admitted to legal practice but merely self-describing himself as an attorney . . . cannot act as an attorney to any juridical entity or natural person in the court of law; he can only act as his own counsel. Hence, [no self-designated "attorney"] may represent any [plaintiff unless] he is an attorney duly admitted to practice in this District; otherwise, [the party] can act only represent himself. Accord Local Civil Rule 11.1 ("In each case, the attorney of record who is a member of the bar of this Court shall personally sign all papers submitted to the Court or filed with the Clerk").

Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *94-95 (D.N.J. July 30, 2009).

Since "Mohammedan Consul Es Lamont Durell Belton" neither provided this Court with any verifications of his/her admission to practice in this District, and this Court's official records of admitted counsel contain no reference to "Mohammedan Consul Es Lamont Durell Belton," "Mohammedan Consul Es Lamont Durell Belton" cannot act as a legal counsel to Clifton or Drexel.

6. Furthermore, while both Clifton and Drexel, being – seemingly – natural persons, can litigate their claims in forma pauperis, they must first obtain in forma pauperis status by submitting a valid application to that effect or, in alternative, by submitting the filing fee of $350 per each action.

7. Finally, and paramountly here, a pleadings executed by either Clifton or Drexel could operate as a cognizable civil complaint only if such pleading complies with the requirements of Rule 8 of the Federal Rules of Civil Procedure. Specifically, a civil complaint must conform to the requirements set forth in Rules 8(a) and (e). The Rules require that the complaint be simple, concise, direct and set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993); cf. McNeil v. United States, 508 U.S. 106, 113 (1993) (procedural rules in civil litigation should not be interpreted so as to excuse mistakes by those who proceed without counsel); Burks v. City of Philadelphia, 904 F. Supp. 421, 424 (E.D. Pa. 1995) (pleading which represented a "gross departure from the letter and the spirit of Rule 8(a)(2)" in failing to contain a short and plain statement of claims struck by District Court); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (affirming dismissal of pro se civil

rights complaint naming numerous defendants, setting forth numerous causes of action, and numbering fifteen pages and eighty-eight paragraphs). Here, each of the submissions at bar fails to comply with the requirements of Rule 8. "A District courts should not have to read and decipher tomes disguised as pleadings." Lindell v. Houser, 442 F.3d 1033, 1035 n.1 (7th Cir. 2006). A fortiori, the Court has no obligation to weed its way through the thickets of"Marrakush" argot, senseless Latin phrases, references to the treaties having no relation to the factual allegations raised, etc.

IT IS, THEREFORE, on this 15th day of October , 2012,

ORDERED that the submission docketed as Docket Entry No. 1 in Mohammedan Consul Es Lamont Durell Belton v. Malfeasance Task Force, Civil Action No. 12-3519 (RBK) (D.N.J.), is dismissed for Mohammedan Consul Es Lamont Durell Belton's lack of standing. Such dismissal is without prejudice to Clifton McMillan's filing of a civil complaint executed on his own behalf, in accordance with the requirements of Rule 8, as detailed herein, and without any resort to "Marrakush" argot, any references to the Barbary Treaties or any other references to irrelevant legal sources or "Marrakush"-type rights. Such properly executed complaint must be accompanied by the applicable filing fee of $350 or by Clifton McMillan's duly executed in forma pauperis application; and it is further

ORDERED that the submission docketed as Docket Entry No. 1 in Mohammedan Consul Es Lamont Durell Belton v. Malfeasance Task Force, Civil Action No. 12-3520 (RBK) (D.N.J.), is analogously dismissed for Mohammedan Consul Es Lamont Durell Belton's lack of standing. Such dismissal is without prejudice to Drexel McMillan's filing of a civil complaint executed on his own behalf, in accordance with the requirements of Rule 8 and without any resort to

"Marrakush" argot, references to the Barbary Treaties or any other references to irrelevant legal sources or "Marrakush"-type rights. Such properly executed complaint must be accompanied by the applicable filing fee of $350 or by Drexel McMillan's duly executed in forma pauperis application; and it is further

ORDERED that the Clerk shall administratively terminate each of the above-captioned actions without filing the submissions received and without assessing a filing fee, by making a new and separate entry on the docket of each of the above-captioned actions, reading "CIVIL CASE TERMINATED"; and it is further

ORDERED that administrative termination is not a dismissal on merits, and Clifton McMillan and/or Drexel McMillan may have their respected matters reopened in the event they submit, within sixty days from the date of entry of this Memorandum Opinion and Order, their own duly executed civil complaints and accompany each of these complaints by the filing fee of $350 (or by their own, duly executed under penalty of perjury, applications to proceed in their respective matters in forma pauperis); and it is further

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon the addressee designated in the submissions made in the above-captioned matters; and it is finally

ORDERED that the Clerk shall include in the said mailing: (a) two blank application form for the individuals wishing to prosecute a civil complaint in forma pauperis; (b) two blank civil complaint forms (which the Court strongly urges Clifton McMillan and/or Drexel McMillan to utilize in preparation of their pleadings, that is, in the event Clifton McMillan and/or Drexel McMillan elect to file a civil complaint); (c) copies of the docket sheets created in these two

matters.

s/Robert B. Kugler
**Robert B. Kugler**
**United States District Judge**